UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADAM BROOK, M.D., PH.D.,
1479 Faxon Street, Memphis, TN 38104,
ADAM BROOK, M.D., PH.D., P.L.L.C.,
350 Central Park West, New York, NY 10025,

                                Plaintiffs,             Case No.

      —  vs —

JUDITH RODGERS, M.H.A., as Senior Advisor in
the Division of Practitioner Data Banks, 5600
Fischers Lane, Rockville, Md. 20857,

KATHLEEN SEBELIUS, M.P.A.  Secretary, U.S.
Department of Health and Human Services, and her
Successors,  200 Independence, Ave., SW,
Washington, D.C. 20201,
UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, DIVISION OF
PRACTITIONER DATA BANKS, 200
Independence, Ave., SW, Washington, D.C. 20201

NATIONAL PRACTITIONER DATA BANK,
4094 Majestic Lane, PMB 332, Fairfax, Va. 22033,

CYNTHIA GRUBBS, J.D., as the Director of the
Division of Practitioner Data Banks, 5600 Fishers
Lane, Rockville, Md., 20857, and

ANASTASIA TIMOTHY, M.D., M.P.H., as NPDB
Dispute Resolution Manager, 5600 Fishers Lane
Rockville, Md., 20857

                                Defendants.

## COMPLAINT

### Jurisdiction and Venue

Plaintiffs Adam Brook, M.D. and Adam Brook, M.D., P.L.L.C. for their complaint herein, by their undersigned attorneys, allege as follows:

1.      Jurisdiction in this Court is based on 5 U.S.C. §§ 701 *et seq.*, the Administrative Procedure Act ("APA"), and 28 U.S.C. § 1331, federal question, in that this Complaint seeks review of final United States agency action made reviewable by statute for which there is no other adequate remedy in any court of competent jurisdiction and the claims arise under the Constitution and laws of the United States.

### Parties

2.      Venue is appropriate in this Court under 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the underlying claims occurred in this District and the defendants Kathleen Sebelius, M.P.A., Secretary, U.S. Department of Health and Human Services, and her Successors, and the United States Department of Health and Human Services are located in and reside in this District.

3.      Plaintiff, Adam Brook, M.D. ("plaintiff physician") is a physician licensed to practice medicine in the State of New York and other states, and is a citizen of the United States. Plaintiff physician graduated from Harvard Medical School and holds degrees of A.B., M.D. and Ph. D. He is certified by the American Board of Surgery and the American Board of Thoracic Surgery. Prior to the events complained of herein arising from a single appendectomy surgical case in October 2009, plaintiff physician had no disciplinary actions commenced against him in over 3000 surgical cases and never suffered a medical malpractice judgment or payment on his behalf. Further, the patient in the October, 2009 case had a normal recovery and discharge, and

2

no claims have been brought by or on behalf of the patient against plaintiffs or the hospital where plaintiff was the Director of Thoracic Surgery and had clinical privileges.

4.      Plaintiff physician is a legal resident of Tennessee but currently lives and works outside the United States because he has been precluded from practice in the United States by a false and fraudulently obtained Adverse Action Report (the "AAR") filed with defendant the National Practitioner Databank ("NPDB") and wrongfully maintained by the NPDB and defendants, as hereinafter set forth. This improper AAR has for the last two and one half years caused all prospective employers to reject plaintiff physician's applications for employment and medical staff privileges. On June 25, 2012, defendants issued a Secretarial Review Decision which refused to void or revise the AAR.

5.      In 2009, while a citizen and resident of the United States, plaintiff was the subject of the wrongful AAR filed with the NPDB by Richard Kubiak, M.D., an employee of Peconic Bay Medical Center ("PBMC"), a hospital located in Riverhead, New York. Prior to the filing of the AAR, plaintiff had clinical privileges as a thoracic surgeon and general surgeon at PBMC.

6.      Plaintiff physician is the sole owner of a New York professional limited liability company Adam Brook, M.D., Ph.D., P.L.L.C. ("the PLLC") with a principal place of business in New York, NY. Plaintiff PLLC bills for and collects professional fees solely for plaintiff physician's surgical services, rendered in the United States. By reason of the wrongful AAR and defendants' failure to void the AAR as hereinafter set forth, plaintiff PLLC has not been able to bill for or collect professional fees for services that would have been provided had the defendants' wrongful conduct hereinafter alleged not prevented plaintiff physician from obtaining hospital privileges in the United States and has therefore suffered substantial economic injury.

3

7.     Defendant Judy Rodgers, M.H.A. ("Rodgers"), is a Senior Advisor in the Division of Practitioner Data Banks.  As such, she is responsible in part for the acts of the NPDB in receiving and assisting in the administration and review of Adverse Action Reports filed with the NPDB pursuant to the HCQIA, including the Secretarial Review Decision issued by HHS on June 25, 2012.

8.     Defendant the United States Department of Health and Human Services ("HHS") is the federal agency designated under the Health Care Quality Improvement Act of 1986, as amended, 42 U.S.C. §§ 11101 *et seq.* ("HCQIA") to oversee and administer the filing, receipt and voiding of reports from health care entities such as PBMC, and others, as prescribed in the HCQIA.  Such reports include Adverse Action Reports which are mandatory under HCQIA if meeting the statutory and regulatory conditions for filing.

9.     Defendant Kathleen Sebelius, M.P.A. is the Secretary of HHS (the "Secretary"), duly appointed, qualified and acting as the administrative head of such agency/department.  As such, she is responsible in whole or in part for its acts including the Secretarial Review Decision issued by HHS on June 25, 2012.

10.     Defendant Division of Practitioner Data Banks ("DPDB") is an entity of, administered and operated by HHS, and has offices in Rockville, Maryland whereby information purportedly as to physicians' competence is received, maintained and disseminated in response to queries from hospitals and other authorized entities.

11.     Defendant National Practitioner Data Bank ("NPDB") is an entity of, administered and operated by HHS, and has offices in Fairfax, Virginia whereby information purportedly as to physicians' competence is received, maintained and disseminated in response to queries from hospitals and other authorized entities.

12.     Defendant Cynthia Grubbs, J.D., ("Grubbs") is the Director of the Division of
Practitioner Data Banks. As such, she is responsible in part for the acts of the NPDB in
receiving and assisting in the administration and review of Adverse Action Reports filed with the
NPDB pursuant to the HCQIA, including the Secretarial Review Decision issued by HHS on
June 25, 2012.

13.     Defendant Anastasia Timothy, M.D., M.P.H., is the "Dispute Resolution
Manager" at the NPDB who functioned on defendants' Secretarial Review of the AAR and is
responsible in part for the acts of the NPDB in receiving and assisting in the administration and
review of Adverse Action Reports filed with the NPDB pursuant to the HCQIA, including the
Secretarial Review Decision issued by HHS on June 25, 2012.

### Facts

14.     Pursuant to the HCQIA, certain information and reports relating to a physician's
licensure, clinical privileges and credentials, among other things, must be reported to the NPDB.
The NPDB functions as an administrative arm of the HHS to receive, record, administer and
disseminate information received under the HCQIA, including Adverse Action Reports filed
concerning physicians.

15.     In May 2009, plaintiff commenced employment and his clinical practice at
PBMC as Director of Thoracic Surgery.

16.     In mid-September 2009, Ms. Patricia Watson of the American Board of Thoracic
Surgery advised plaintiff physician that, if he wanted to become Board Certified in thoracic
surgery, it was likely that he would be required to complete an additional year of training at the
University of Tennessee, to include an additional 125 cases. She also told plaintiff physician that
the Credentials Committee of the American Board of Thoracic Surgery (the "ABTS Credentials

Committee") would be meeting on October 3, 2009, and would make its final decision during that meeting. Thus plaintiff physician expected he might have to leave PBMC in 2009 to resume fellowship training in preparation for Board certification.

17.    On October 3, 2009, the ABTS Credentials Committee did in fact decide that plaintiff physician would need to return to the University of Tennessee for one year to obtain more senior-level experience in cardiac surgery.

Plaintiff's October 2, 2009 Emergency Case

18.    While plaintiff physician was waiting for the outcome of the ABTS Credential Committee's October 3, 2009 meeting, on October 2, 2009, an adolescent girl presented to PBMC's emergency room, where plaintiff physician was on call, with acute appendicitis. The patient's condition was serious, exhibiting symptoms of severe abdominal pain, peritoneal inflammation and elevated white blood cell count.

19.    Despite preoperative and intraoperative complications, including severe inflammation from a perforated appendix and location of the appendix in a retrocecal position and an inflamed band adherent to the cecum, plaintiff physician, assisted by a senior surgeon who was the Hospital's former Chairman of Surgery, successfully completed an emergency laparoscopic appendectomy on the patient.

20.    In the course of the procedure with these complications, the surgeons encountered an inflammatory band overlying the lateral peritoneal reflection and adherent to the cecum. They determined it was necessary and appropriate to divide the inflammatory band in order to complete the surgical removal of the perforated appendix and save the patient's life. The procedure was completed successfully and the patient was discharged from the hospital a few days later.

6

21.    On October 5, 2009, the pathology report confirmed that the removed structures were the perforated appendix and that the inflammatory band was part of the right Fallopian tube, which was notable for "serosal adhesions and marked vascular congestion" and a 1 cm cyst. "Marked vascular congestion" is an indication of severe inflammation.

22.    On October 5, 2009, plaintiff physician and the senior assistant surgeon met with the patient's parents and explained the operation and the pathology. The surgeons assured both parents that their daughter would be able to have children because of the presence of a healthy left Fallopian tube. In response, the patient's parents expressed their gratitude to plaintiff physician for having saved their daughter's life. No claims were filed by the parents or the patient against plaintiffs, the other doctors or the Hospital.

23.    In or about this time, plaintiff physician learned that he was going to have to return to the University of Tennessee to complete another year of cardiothoracic surgery fellowship in preparation for his Board exam. On October 5, 2009, plaintiff physician advised Dr. Richard Kubiak ("Kubiak"), PBMC's Vice President of Medical Affairs, that he would likely need to resign his position at PBMC to return to Tennessee to complete the fellowship.

24.    Plaintiff physician knew that a resignation while under or to avoid investigation relating to professional conduct or competence would be a reportable event. Therefore, prior to tendering any resignation, plaintiff physician specifically inquired of Kubiak whether plaintiff physician was under any investigation by PBMC on account of the October 2, 2009 surgery or for any other reason. Plaintiff physician unequivocally advised Kubiak that he would not resign if such an investigation was pending or would be commenced. On October 5, 2009 and again on October 7, 2009, Kubiak responded to plaintiff physician that there was no and would be no investigation of plaintiff physician on account of his clinical practice.

25.     Kubiak had superior and unique knowledge as to the status of investigations at PBMC and his special relationship as Vice President of Medical Affairs of PBMC both to the medical staff members themselves and to the public with respect to the granting, renewing or suspension of privileges of medical staff members in the hospital. Accordingly, plaintiff physician accepted and reasonably relied on Kubiak's repeated and unequivocal representations that there was no and would be no investigation of plaintiff physician's clinical practice.

26.     On October 7, 2009, in reliance on Kubiak's affirmative representations that there was no and would be no investigation by PBMC of his clinical practice, plaintiff physician submitted his resignation to PBMC to be effective October 16, 2009, and soon thereafter left Riverhead, New York to pursue his fellowship at the University of Tennessee.

27.     However, contrary to Kubiak's affirmative representations, and unknown to plaintiffs at the time, Kubiak and PBMC took the position that plaintiff physician surrendered clinical privileges while under investigation, an event reportable to defendant NPDB.

28.     In fact, plaintiff physician was never "under investigation" within the meaning of the Act or the regulations issued by defendants thereunder. The PBMC By-Laws prescribe detailed procedures for "summary suspension" and commencement of an investigation of a practitioner by the hospital's Credentials Committee. As hereinafter set forth, these By-Law procedures require written notices to request such action with a Special Notice (defined as a written notification sent by certified mail, return receipt requested) to the physician in writing. PBMC never complied with these requirements, never informed plaintiff physician of an investigation, and no *bona fide* investigation was commenced prior to plaintiff physician's resignation. In addition, plaintiff physician never voluntarily agreed to refrain from exercising his clinical privileges pending any investigation about which he was never informed.

8

29.     After plaintiff physician's resignation, PBMC asserted to defendants that an incident report had been prepared concerning the October 2, 2009 surgery for submission to the State of New York Department of Health ("NYDOH") and that this qualified as an "investigation" by the Hospital under the HCQIA.  Upon information and belief, Kubiak knew of this alleged Incident Report at the time of his representations to plaintiff physician that there was no investigation.  Kubiak and PBMC also later took the position that the Hospital was investigating plaintiff physician's clinical practice as of October 5, 2012 and as of plaintiff's letter of resignation submitted October 7, 2009.

30.     The Incident Report is not a document identified in the PBMC By-Laws as a step in the entity initiating any "investigation" of a physician's practice, which must be done by written notice to the Credentials Committee.  Moreover, the Incident Report as provided to defendants was incomplete, redacted, showed no signature and one page showed a fax header of a New York City law firm marked page "003," raising issues as to authenticity.  Despite the foregoing deficiencies, the defendants accepted the document and improperly relied on it as evidence of an entity investigation under the HCQIA.

31.     In addition, PBMC later advised defendant NPDB that in October, 2009 on an unspecified date but prior to a Root Cause Analysis ("RCA") Committee meeting and prior to the October 16, 2009 effective date of plaintiff physician's resignation, the care provided by plaintiff physician during the laparoscopic appendectomy case was reviewed at a Hospital Medical Staff Performance Improvement Committee meeting.  The document the Hospital actually submitted to the defendant NPDB and accepted by the NPDB as "proof" of that meeting was redacted and incomplete, and dated "September 2009," a date false or backdated on its face since the events in question did not begin until October 2, 2009.  Moreover, the PBMC By-Laws

require investigations to be commenced at the request "in writing" of specified individuals to the "Credentials Committee," not a "Medical Staff Performance Improvement Committee."

32.     Likewise, PBMC later advised defendant NPDB that on October 14, 2009 and again prior to the October 16, 2009 effective date of plaintiff's resignation, the RCA Committee allegedly met to consider plaintiff physician's case, with personnel identified as including the "Vice President of Nursing" and an "Attending Gynecology Oncology Surgeon," and an "Attending General/Thoracic Surgeon," among others. No documentation was submitted by PBMC to defendants concerning this alleged meeting.

33.     During defendants' Secretarial Review of the AAR, plaintiff submitted evidence that neither the Attending Gynecology Oncology Surgeon referred to, nor the Attending General/Thoracic Surgeon referred to, attended the alleged October 14, 2009 meeting. This evidence includes a letter signed by the Attending Gynecologic Oncology Surgeon, dated June 14, 2011, expressly stating that she had not attended an RCA meeting concerning plaintiff's case, and in which she stated "Let me assure you that you are a competent physician and will excel in your field. It was a pleasure working with you . . . ." Plaintiff physician also informed the NPDB that the Attending General/Thoracic Surgeon did not attend the purported RCA meeting.

34.     Defendants' acceptance and maintenance of the AAR, despite submission of this uncontradicted documentary evidence that there was no RCA meeting with these individuals, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA.

35.     Despite the fact that plaintiff physician's resignation was not yet effective, through all these events, PBMC also never complied with its By-Laws to conduct an investigation by the Credentials Committee of the Hospital "which shall include a Special Notice

10

to the Practitioner involved about the investigation." The PBMC By-Laws define "Special Notice" as "written notification sent by certified mail, return receipt requested." (Definition 22.) No such Special Notice was ever provided to plaintiff physician or submitted by PBMC to the defendants, despite the purported investigation allegedly commencing and continuing for at least 11 days prior to the effective date of plaintiff physician's resignation and thereafter.

36.     Defendants knew that plaintiff physician never received such a written Special Notice either prior to or after the effective date of his resignation. Accordingly, defendants' acceptance and maintenance of the AAR despite the lack of such written evidence required under the By-Laws was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA.

37.     The defendant NPDB Guidebook at page E-19 states that an "investigation must be carried out by the health care entity, not an individual on staff." The evidence before the defendants showed that PBMC did not conduct an investigation in accordance with its own By-Laws. Nor did PBMC ever issue either a written request for investigation to the Credentials Committee or notice to the physician, or otherwise instituted or carried out as required by the Hospital's By-Laws.

38.     The defendant NPDB Guidebook at page E-19 further states that a health care entity that submits an AAR based on surrender of privileges while under investigation "should have contemporaneous evidence of an ongoing investigation at the time of surrender . . . [and] should be able to produce evidence that an investigation was initiated **prior** to the surrender of clinical privileges by a practitioner. Examples of acceptable evidence may include minutes of excerpts from committee meetings, orders from hospital officials directing an investigation, and notices to practitioners of an investigation." (Emphasis added.) Upon information and belief,

11

defendants never received such evidence, and there were no minutes of any investigation by the "Credentials Committee" prior to the October 7, 2009 resignation letter, as required by the By-Laws. Instead, the defendants accepted documents showing actions of individuals "on staff" not instituting an investigation by the entity in accordance with any of its By-Laws prior to October 7, 2009.

39.     Accordingly, defendants' acceptance and maintenance of the AAR despite the lack of contemporaneous evidence as specified in the NPDB Guidebook of an investigation commenced "prior" to plaintiff physician's resignation, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA.

40.     In addition, since plaintiff physician had unequivocally advised Kubiak that he would not resign if such an investigation was pending or to be commenced, plaintiff physician was misled by Kubiak's statements on behalf of the Hospital that there was no investigation, and that there would be no such investigation. Plaintiff physician was thus misled and defrauded by the Hospital when he tendered his resignation prior to completion of any purported PBMC investigation into his professional competence. But for those affirmative misrepresentations, plaintiff physician would not have tendered his resignation but would have maintained his position at PBMC and defended the quality of his surgical practice and would not and could not have been reported to the defendant NPDB as the Hospital did, for "voluntary surrender of clinical privileges while under, or to avoid, investigation relating to professional competence or conduct."

41.     PBMC did not report its "acceptance of [plaintiff physician's] surrender of clinical privileges while under investigation for possible professional incompetence" to the NPDB within 15 days as PBMC would have been required to do by the NPDB Guidebook

12

(page E-17) had Plaintiff physician actually been under investigation "for possible professional incompetence."

42.     Nor did PBMC submit information regarding the "acceptance of the surrender of [plaintiff physician's] clinical privileges" "while under investigation relating to possible incompetence" "to the NPDB within 30 days following" PBMC's "acceptance of the surrender of clinical privileges" as PBMC would have been required to do by NPDB regulations 45 C.F.R. §§ 60.5 and 60.11(a)(1)(ii) had plaintiff physician actually been under investigation by PBMC "relating to possible incompetence."

43.     Nor did PBMC report its "acceptance of the surrender of [plaintiff physician's] clinical privileges" "while under investigation relating to possible incompetence" "to the [New York] Board [of Medical Examiners] within 15 days" from the date of the "acceptance of the surrender" as PBMC would have been required to do by NPDB regulations 45 C.F.R. §§ 60.5(d) and 60.11(a)(1)(ii) had plaintiff physician actually been under investigation "relating to possible incompetence."

44.     Instead, two months later, on December 3, 2009, Kubiak on behalf of PBMC, filed the AAR with the NPDB in which Kubiak claimed that plaintiff physician had surrendered his clinical privileges at PBMC "while under, or to avoid, investigation relating to professional competence of conduct." This statement, in addition to being untimely under NPDB regulations, was either false or, if true, was a resignation fraudulently induced by Kubiak's and PBMC's affirmative misrepresentations to plaintiff physician that there was no investigation.

45.     The AAR contained the further statement that since plaintiff resigned,

> Accordingly, the Hospital took no further action regarding the physician's privileges or employment. However, the Hospital's quality assurance review of this matter indicates departures by the physician from standard of care with regard to the laparoscopic appendectomy that he performed on October 2, 2009.

13

46.    Contrary to this statement in the AAR that plaintiff's practice departed from the standard of care, three senior, distinguished surgeons reached the opposite conclusion and found that plaintiff physician's practice in the case was within or exceeded the standard of care. These surgeons were (i) Dr. Richard Rubenstein, the former Chairman of Surgery at PBMC, with over 30 years experience, (ii) the senior surgeon at the NY Office of Professional Medical Conduct ("OPMC") which in May, 2011 closed its review of plaintiff physician's October 2, 2009 surgical case with no further action and no restriction on his license to practice, and (iii) Dr. Steven Hofstetter, one of the leading abdominal surgeons in the world with 35 years of experience, having performed thousands of operations and chaired many surgical review committees. Dr. Hofstetter is the Surgeon-in-Chief at New York University ("NYU") Hospitals Center and the Vice-Chairman of the Department of Surgery NYU School of Medicine in New York City.

47.    The AAR was assigned number is 5500000059633157 by the NPDB and placed in its files for access by all queriers concerning the plaintiff physician.

48.    When submitting the AAR in December, 2009, PBMC provided a knowingly false address for the plaintiff physician as being at the Hospital's address, when PBMC knew that he had left PBMC and left Riverhead, New York in order to participate in the fellowship at the University of Tennessee. As a result, plaintiff was not informed of the filing of the false AAR at or near the time it was filed or for almost six months later.

49.    Over the following months, plaintiff physician was successfully completing his fellowship in thoracic surgery at the University of Tennessee and was preparing to take the ABTS examination to become Board Certified in Thoracic Surgery. In or about May, 2010,

14

plaintiff physician sought future employment as a thoracic surgeon at Reston Hospital Center in

Reston, Virginia, still unaware that a false AAR report had been filed with the NPDB.

50.     On May 12, 2010, Ms. Cindy Markwell, Director of Medical Staff Development

at Reston Hospital Center in Reston, Virginia, informed plaintiff physician that Reston Hospital

Center wished to interview him.  Reston Hospital Center is operated by Hospital Corporation of

America ("HCA").  Upon information and belief, HCA, with 163 hospitals, is the largest private

operator of health care facilities in the world.

51.     On June 1, 2010, Ms. Markwell e-mailed plaintiff physician as follows:

> I am sorry to have to tell you that we won't be able to meet with you on June 7th.  A report from
> the National Practitioner Data Bank shows a "Voluntary Surrender of Clinical Privilege(s), While
> Under, or to Avoid, Investigation Relating to Professional Competence or Conduct" for an event
> that occurred in October, 2009.  A resignation under these circumstances would preclude your
> being credentialed at Reston Hospital Center.

52.     This advice from Reston Hospital Center was the first time that Plaintiff physician

learned of the filing of the false AAR with the NPDB.  On or about June 3, 2010, he requested a

copy of the AAR by a self-query with defendant NPDB and first read the AAR filed against him.

53.     On June 1, 2010, the Vice-President for Medical Staff Affairs at Reston Hospital

Center told plaintiff physician that not only was it HCA policy not to interview any healthcare

provider with an NPDB privileges report, but that Reston Hospital Center would be sending a

copy of the NPDB report on him to HCA headquarters in Nashville. As a result, the plaintiff is

forever barred from employment at every HCA hospital in the world.

54.     On June 1, 2010 and again on June 4, 2010, plaintiff physician asked Kubiak and

PBMC to void the Adverse Action Report.

55.     On July 3, 2010, plaintiff physician submitted a responsive Subject Statement to

the Databank and placed Report 5500000059633157 in disputed status challenging both the

15

factual accuracy of the report and whether the report was submitted in accordance with the NPDB's reporting requirements.

56.    On August 4, 2010, Leonard Rosenberg ("Rosenberg"), an attorney for PBMC, sent a fax to plaintiff's then attorney stating that "the Medical Center declines to void its report to the NPDB [National Practitioner Data Bank]."

57.    After PBMC refused to void the Adverse Action Report, on August 20, 2010, plaintiff physician sought Secretarial Review of the disputed report.

58.    On March 5, 2012, plaintiff submitted a supplemental Subject Statement further contesting the allegations in the AAR.

59.    The defendants took nearly two years from the date the review was requested before rendering a decision on the Secretarial Review. From the time of filing of the false AAR and during the almost two years of the defendant Secretary's review without a decision, plaintiff physician's reputation and career were severely damaged by the maintenance of the false AAR on the NPDB database, where it was accessed and reviewed by United States hospitals where plaintiff physician subsequently sought to obtain employment and clinical privileges. Upon information and belief, in every case, his applications for employment and privileges would have been accepted but for defendants' maintenance of the false AAR report. Because of the AAR and defendants' improper refusal to void it, plaintiff physician to date has been unable to obtain hospital privileges or employment in the United States. This has resulted in severe economic harm to both plaintiffs.

60.    During this same period, as a direct result of plaintiff physician being rejected from every United States hospital where he sought employment or privileges due, upon information and belief, to defendants' acceptance and maintenance of the false AAR on the

defendant NPDB database, plaintiff PLLC has been unable to bill for or collect any revenue for

surgery which plaintiff physician would have performed had he been able to obtain hospital

privileges.

61.     Prospective employer hospitals which queried the NPDB on plaintiff physician,

and subsequently became uninterested in employing plaintiff physician, included on June 27,

2011 Baptist Regional Medical Center in Kentucky, on July 25, 2011 Natchez Regional Medical

Center in Mississippi, and on August 21, 2011 Muskogee Regional Medical Center in Oklahoma.

62.     On June 25, 2012, the Secretary finally issued her Secretarial Review Decision

finding and ordering that Report 5500000059633157 was accurate, "for agency purposes" "was

timely" and should have been filed.  Plaintiff physician's request that Report 5500000059633157

be voided was denied.  Said Secretarial Review Decision constitutes the agency's final order.

Plaintiff physician was informed of the decision by a confidential letter and explanation sent to

him by defendant Rodgers.

63.     At the same time, the June 25, 2012 decision of the defendants expressly asserted

that there were five (5) disputes it could not decide, including:

    a)      "The Secretary cannot conduct an independent review of the surrender or

resignation;"

    b)      "inquire whether an investigation was warranted;"

    c)      "whether a professional review action would have been taken if the

investigation had been completed"

    d)      "whether the 'due process' provided or to be provided by the reporting

entity was adequate;"

    e)      "substitute [the Secretary's] judgment for that of the entity."

64.     As a result of the foregoing action by the defendant Secretary and other defendants, the false AAR, the plaintiff's Subject Statement, and the Secretarial Review Decision have been entered and maintained in the NPDB for dissemination to all entities which queried and received a copy of the AAR concerning the plaintiff physician in the past three years. Further, unless voided and enjoined by this Court, these materials and the Secretarial Review Decision will be disseminated to all future entities who request a NPDB report on the plaintiff physician.

65.     As a result of the dissemination of the foregoing NPDB report, and unless the AAR and NPDB record are voided and enjoined from dissemination by this Court, plaintiffs have and will suffer great and irreparable harm to their reputation, property, business, trade, profession, and occupation, as well as harm to their present and future business and professional relationships with hospitals, clinics, PPO/HMO credentialing entities, and other such individuals and entities.

66.     Plaintiffs have exhausted all administrative remedies available to them, and no further right of agency review or appeal is available to plaintiffs before HHS or the NPDB.

### FIRST CAUSE OF ACTION TO SET ASIDE REPORT AS ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION AND NOT IN ACCORDANCE WITH LAW

67.     Plaintiffs reallege and incorporate herein as if fully set forth, the allegations contained in paragraphs 1 through 66 of this Complaint.

68.     5 U.S.C. § 706 states in relevant part:

> The reviewing court shall—
>
> ...
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

18

69.     Defendants' actions with regard to Adverse Action Report 5500000059633157, and the acceptance and maintenance of same, were unlawful in that said actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as hereinafter more fully set forth.

There Was No Investigation by the Entity

70.     Among other things, the defendants accepted and refused to void the AAR claiming plaintiff physician resigned while under investigation when there was no contemporaneous evidence of such an investigation as required by the HCQIA, and the report was untimely filed with NPDB.

71.     As hereinabove alleged, the defendants' NPDB Guidebook at page E-19 states that a health care entity that submits an AAR based on surrender of privileges while under investigation "should have contemporaneous evidence of an ongoing investigation at the time of surrender . . . [and] should be able to produce evidence that an investigation was initiated **prior** to the surrender of clinical privileges by a practitioner.  Examples of acceptable evidence may include minutes of excerpts from committee meetings, orders from hospital officials directing an investigation, and notices to practitioners of an investigation."  Upon information and belief, defendants never received such evidence and there were no minutes of any investigation as of October 7, 2009 by the "Credentials Committee" as required by the hospital By-Laws.

72.     Accordingly, defendants acceptance and maintenance of the AAR despite the lack of such contemporaneous evidence of an investigation commenced "prior" to plaintiff's resignation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA.

Resignation Was Obtained by Fraud, Not Voluntary

73. Alternatively, if there was an investigation of plaintiff physician, he was affirmatively misled as to its existence, thus procuring his resignation by fraud or negligence when he would otherwise not have resigned and not have been reported. Defendants should therefore have concluded that plaintiff did not "voluntarily resign" for purposes of the statute and the AAR should not have been accepted or should have been voided.

74. The defendant NPDB Guidebook at page F-8 states that "the practitioner need not be aware of an ongoing investigation at the time of the resignation in order for the entity to report the resignation to the NPDB." This Guidebook provision is not contained in the HCQIA as enacted into law, or the regulations adopted thereunder, and was not adopted with any public notice or comment. On its face, this administrative Guidebook interpretation is overbroad, over-inclusive and contrary to the purposes of the HCQIA because it makes reportable and thereby brands as "incompetent" practitioners who are competent and who would have not surrendered clinical privileges but would have successfully defended their practice under investigation if given notice of the investigation. Defendants' Guidebook interpretation that a physician can be reported for a resignation without knowledge of an investigation is also contrary to the legislative history and House Report for such resignations under the HCQIA which states that "resignation under investigation" was included "to ensure that health care entities will not resort to 'plea bargains' in which a physician agrees to such a surrender in return for the health care entity's" not informing others about the circumstances, a situation that necessarily requires that the physician had knowledge of the investigation, or there would be no need for concern over a possible "plea bargain." Accordingly, defendants' adoption and application of this Guidebook interpretation is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

Even if the interpretation were proper, it should not have been applied by defendants in this case, where plaintiff was not merely "not aware" but was affirmatively misled to resign by the reporting entity, a fact the Hospital did not even deny to defendants.

75.     Specifically, the defendant's Guidebook interpretation that the defendants will accept an AAR even if the physician was not "aware" of an investigation at the time of surrender of clinical privileges is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law as applied in this case by defendants to accept and maintain the AAR, when plaintiffs have alleged and submitted evidence that there was fraud and affirmative misrepresentation by the reporting entity, PBMC, but for which plaintiff would not have resigned. Therefore, there was no "voluntary resignation while under or to avoid such an investigation," but a resignation obtained by fraud and deceit perpetrated on a physician who was prepared to defend his practice. This is contrary to the purpose of the HCQIA, which is to protect the public by preventing incompetent physicians from voluntarily resigning to avoid investigations in order to practice elsewhere. The HCQIA may not be applied by defendants to accept damaging reports on competent physicians who are deceived to resign during an alleged investigation. Defendants failed to discharge their duty to determine if plaintiff physician was deceived in connection with the resignation.

76.     In view of these allegations of fraud and affirmative misrepresentation, which the hospital did not dispute, but which defendants expressly declined to consider, defendants' acceptance and maintenance of an AAR based on a fraudulently obtained "resignation," is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

21

The AAR Report Was Untimely as Matter of Law

77.     Furthermore, the AAR was manifestly untimely. Since plaintiff physician

submitted his resignation letter to Kubiak on October 7, 2009 effective October 16, 2009, and

since Kubiak accepted the letter on October 7, 2009, under 45 C.F.R. § 60.11(a) the acceptance

of the surrender of clinical privileges and occurred on October 7, 2009 or at the latest

October 16, 2009. Under applicable law and regulations, 45 C.F.R. §§ 60.5(d) and 60.11(a),

PBMC was required to report the Adverse Action Report to the NPDB "within 30 days following

the action to be reported" *i.e.* by November 6, 2009, and to the New York State Board for

Medicine "within 15 days from the date the adverse action was taken or clinical privileges were

voluntarily surrendered " *i.e.* by October 22, 2009. PBMC failed to do so and accordingly the

report of surrender of privileges, in addition to being false and fraudulently obtained, was

untimely as a matter of law. Defendants also failed to consider this two-month delay as evidence

that there was no investigation at the time of resignation or the report would have been timely

made, especially when combined with the lack of "contemporaneous" evidence of an

investigation as specified by the By-Laws.

78.     The NPDB Guidebook at page E-17 states:

> Reporting Adverse Clinical Privileges Actions [to the NPDB]
>
> Health care entities must report adverse actions within 15 days from the date the adverse
> action was taken or clinical privileges were voluntarily surrendered. The health care
> entity must print a copy of each report submitted to the NPDB and mail it to the
> appropriate State licensing board for its use. The Report Verification Document that
> health care entities receive after a report is successfully processed by the NPDB should
> be used for submission to the appropriate State licensing board.

79.     Upon information and belief, PBMC did not report the Adverse Action Report to

an appropriate New York State licensing board and the NPDB as above required within 15 days

of October 7, 2009, which would have been by October 22, 2009. Accordingly, the Report is

improper and unlawful and should have been rejected or thereafter declared untimely and voided by defendants during the Secretarial Review process.

80.     As per 45 C.F.R. § 60.5, PBMC was required to submit the Adverse Action Report ("information required under §§ 60.7, 60.8, and 60.11") to the NPDB "within 30 days following the action to be reported" *i.e.* by November 6, 2009.

81.     Since PBMC did not submit the Adverse Action Report to the NPDB until December 3, 2009, the Report was untimely, improper and unlawful and should have been rejected or thereafter declared untimely and voided by the defendants during the Secretarial Review process.

82.     The failure of the NPDB and the other defendants to follow the Code of Federal Regulations and NPDB's own Guidebook with regard to these issues, including the lack of evidence of an investigation and the untimeliness of PBMC's submissions, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The Hospital's Subsequent *Ex Parte* "Review" Was Not a Reportable Event

83.     In addition, the applicable law and regulations require reporting as an adverse action a "professional review action" that adversely affects the physician's clinical privileges only if lasting "longer than 30 days." 42 U.S.C. § 11133(a), 42 U.S.C. § 11151(9), 42 C.F.R. § 60.11 and the NPDB Guidebook at page E-19 ("summary suspensions" for more than 30 days), page E-17 (actions that "adversely affect" clinical privileges for more than 30 days).

84.     The NPDB's own Guidebook at page E-19 states:

> Investigations should not be reported to the NPDB; only the surrender or restriction of clinical privileges while under investigation or to avoid investigation is reportable."

85.     However, the last two sentences of the AAR which PBMC submitted to the defendant NPDB stated that since plaintiff resigned,

23

Accordingly, the Hospital took no further action regarding the physician's privileges or employment. However, the Hospital's quality assurance review of this matter indicates departures by the physician from standard of care with regard to the laparoscopic appendectomy that he performed on October 2, 2009.

86.     Since the AAR acknowledged that there was no actual "restriction", "suspension", or "effect on" plaintiff's clinical privileges on account of the alleged quality assurance review, the report's statement of what the alleged quality assurance review "indicat[ed]" without an actual restriction occurring is a non-reportable event and should have been neither reported nor accepted but voided.

87.     Defendants' acceptance of the AAR with this improper statement and failure to void it or strike it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## SECOND CAUSE OF ACTION TO DECLARE THE HCQIA AS INTERPRETED AND APPLIED BY DEFENDANTS AS AN UNCONSTITUTIONAL TAKING WITHOUT DUE PROCESS

88.     Plaintiffs reallege and incorporate herein as if fully set forth, the allegations contained in paragraphs 1 through 87 of the Complaint.

89.     Plaintiff and other physicians, who are granted a professional license to practice medicine by a State of the United States have thereby obtained a valuable property right. Plaintiff physician and other physicians who have, or have had, clinical privileges also have a valuable property right. Plaintiff's and other physicians' right to engage a profession of their choice is a valuable liberty interest. These property rights and liberty interests are protected under the United States Constitution.

90.     Defendants' acceptance, maintenance and dissemination of an AAR against practitioners, and plaintiff physician in particular on account of alleged surrender of privileges, arises from particular action involving their prior employment and automatically excludes them

24

from a definite range of constitutionally-protected right to employment in their chosen profession. Such conduct by the defendants under the HCQIA effects, without due process, a tangible change in plaintiff physician's and similarly reported physicians' status, disqualifying them from significant employment opportunities, impairing their ability to obtain clinical privileges, and imposes a stigma and disability that forecloses their freedom to take advantage of other employment opportunities. Such conduct by defendants under the HCQIA has the effect of rendering these physicians unemployable as physicians and therefore deprives and diminishes physicians and plaintiff physician of their liberty, property and occupation and does so without due process of law, as more fully set forth herein. This is irreparable harm which should be enjoined by this Court.

91.     More specifically, the HCQIA requires that prospective employers query the NPDB before hiring a new physician. 42 U.S.C. § 11135(1). This is for the ostensible purpose of preventing incompetent physicians from obtaining new employment. However, the defendants accept and disseminate adverse information about a physician in these reports without any procedurally-safeguarded opportunity to contest the accuracy of the facts alleged in the reports. Further, defendants' acceptance of such reports without a prior opportunity to challenge the accuracy and dissemination of the information is a violation of due process and constitutionally-protected rights.

92.     According to defendants, and as set forth in the NPDB Guidebook at E-19 and F-6, the defendants will only review whether the entity reporting a surrender of privileges while under investigation had a basis to make the report based on "contemporaneous" documentary evidence of an investigation. Defendants expressly will not review whether the submitted documents are *bona fide*, whether the alleged investigation was warranted, whether it was carried

25

out fairly or with due process, and whether any resulting restriction on privileges was warranted, claiming these matters are "outside the scope of review." NPDB Guidebook pp. F-3 to F-6. Moreover, the limited opportunity afforded by defendants under 42 C.F.R. § 60.16 for plaintiff to submit a letter "in writing, of the disagreement [with the report] and the basis for it" is wholly inadequate to provide due process to dispute the veracity and accuracy of the reporting entity's paper record.

93.     In the present case, defendants in accordance with this improper and unconstitutional application of the law, specifically followed their above stated procedure of failing to make any of the determinations relevant "whether the due process . . . was adequate" or to the merits of plaintiff physician's competence as a physician, which is the ostensible purpose of the HCQIA.

94.     The defendants' express statement in this very case of what they could **not** consider under the HCQIA and their own regulations is a paradigm of the lack of due process. Thus, the Secretarial Review Decision here expressly advised plaintiffs that

   a)     "The Secretary cannot conduct an independent review of the surrender or resignation;"

   b)     "inquire whether an investigation was warranted;"

   c)     "whether a professional review action would have been taken if the investigation had been completed;"

   d)     "whether the 'due process' provided or to be provided by the reporting entity was adequate;"

   e)     "substitute [the Secretary's] judgment for that of the entity."

26

95.    The effect of the law and defendants' application of it is that the defendants

profess lack of authority (and they provide no prior notice, hearing, or trial) to determine

anything other than that the reporting entity has what it claims is "contemporaneous" paperwork

to support the report, which defendants can, and did, choose to accept without affording or

conducting any due process into its veracity. As hereinabove alleged, such paperwork may in

fact be fabricated, back-dated, not contemporaneous, false or disprovable by due process. But

defendants have stated that these issues are "outside the scope" of the defendants' review, and in

any event, no procedures are in place to enable such truth-finding. Defendants' failure to afford

due process protections to plaintiff, or to insure that the reporting hospital has done so, results in

an unconstitutional deprivation of the rights of plaintiffs and similarly-situated physicians. The

defendant NPDB's published Annual Report for 2010 admits at p. 68 that in 2008, in 2009, and

in 2010, the NPDB did not void a single Adverse Action Report in over 150 AARs under review,

submitted by any hospital anywhere in the United States. Upon information and belief,

"Secretarial Review" conducted by defendants in the fashion hereinabove alleged is just a

"rubber stamp" approval. Accordingly, defendants should be required to void the report in this

case and so notify all inquirers.

96.    Further, defendants' NPDB Guidebook rule at page F-8 states that "the

practitioner need not be aware of an ongoing investigation at the time of the resignation in order

for the entity to report the resignation to the NPDB." Defendants' implementation of this self-

serving administrative guideline is unauthorized and as applied, unconstitutional. This provision

is not contained in the HCQIA or Code of Federal Regulations and in effect brands a resigning

physician as actually or likely "incompetent," when in fact they are not and would not have

surrendered clinical privileges and would have successfully defended their practice under

27

investigation if given notice of the investigation. Here, plaintiff physician was exonerated in the case at issue by the New York State Office of Professional Medical Conduct ("OPMC"). Unlike defendants, the OPMC conducts its review of competence with due process.

97.   . Thus, the HCQIA and Code of Federal Regulations as enacted and administered by defendants are unconstitutionally over-inclusive of the purposes of the HCQIA because they make reportable and thereby brand as "incompetent" practitioners who are not incompetent and who could have successfully defended their practice. In at least one reported case, a physician was reported for resigning while under investigation, but ultimately prevailed before the state medical board in proving the charges in the investigation were unfounded. Defendants, informed of these facts, still refused to remove the report of resignation while under investigation, thereby depriving an adjudicated competent doctor, and his potential patients, of his constitutionally-protected right to practice. This is entirely inconsistent with the purposes of the HCQIA.

98.   . The same unconstitutional deprivation has occurred here to plaintiff physician, whose practice in the subject case was examined by the NY Office of Professional Medical Conduct and found not to warrant any discipline or restriction on his practice. Yet plaintiff physician remains reported and unemployable for resigning during an alleged investigation about which he had no knowledge. Moreover, prior to resigning, the plaintiff physician was affirmatively told by the Hospital's Vice President of Medical Affairs that he was not "under investigation" and that nothing would be reported. This demonstrates that the HCQIA and regulations as enacted and administered by defendants effectuate an erroneous and unconstitutional deprivation of significant property and liberty rights.

99.     In actual practice, the maintenance of an AAR against a physician for resigning while under, or to avoid, investigation, as in this case, or alternatively for having privileges

restricted for more than 30 days, as implied by the AAR in this case indicating a "departure from the standard of care," renders a physician, and the plaintiff physician here, unemployable and deprives and severely diminishes both plaintiffs of their right to property and liberty without due process of law.

100.    There is substantial evidence that acceptance, posting and maintenance of such an AAR results in this constitutional deprivation. Upon information and belief, officials of numerous U.S. medical associations have stated that mere existence of such a report with the NPDB will make it "virtually impossible" for the subject of the report to obtain employment as a physician at any U.S. hospital, and "can essentially make you unemployable." It has been called a "career-ender," but imposed without due process before posting and deprivation occur.

101.    The U.S. General Accounting Office in a report concerned with the accuracy of data contained in the NPDB records observed that information disseminated by the defendant NPDB "can affect a practitioner's reputation and livelihood." (*National Practitioner DataBank; Major Improvements Are Needed to Enhance Data Bank's Reliability*, GAO-01-130 (2000) available at http://www.semmelweis.org/ref/8b4.pdf).

102.    Such unconstitutional deprivation is inevitable, given that the purported purpose of the HCQIA is to alert prospective employers that a reported physician is a risk because of issues as to his or her clinical competence. Accordingly, and upon information and belief, prospective employers in the vast majority of cases choose not to hire a physician who has an AAR report on file with the NPDB, because the prospective employer has neither the time, resources nor motivation to undertake an independent investigation as to the veracity of and accuracy of the information contained in the AAR maintained by defendants. Such employers have available to them other applicants with no such adverse AAR reports, who, upon

information and belief, will therefore be hired without the prospective employer fearing risk to its patients or itself from hiring a physician reported as having been investigated or having had privileges suspended, and the further risk to the prospective employer of liability to any patients who might be injured by such a physician under a tort theory such as negligent hiring.

103. Here, plaintiff physician's own experience as alleged is direct evidence of this effect of unconstitutional deprivation, since every hospital to which plaintiff physician has since applied has refused to hire or grant clinical privileges to plaintiff physician on account of the false AAR against plaintiff and considered it in their decisions to reject plaintiff physician. He has been told directly by several of the hospitals at which he has attempted to obtain privileges that, but for the Adverse Action Report they would be very interested in hiring him, but that, because of the Adverse Action Report, they are unable to grant him privileges *as a matter of policy*. The effect of the defendants' refusal to void the Adverse Action Report thereby deprives plaintiff physician of his right to practice his profession without due process.

104. Since being the subject of the AAR filed with the defendant NPDB in December 2009, plaintiff physician has been rejected by more than five U.S. hospitals, and has been told that Hospital Corporation of America, which has over 150 hospitals in the U.S., will not ever employ him or grant him clinical privileges because of the Adverse Action Report. In fact, he has not been able to obtain new employment as a physician in the U.S. despite his otherwise excellent background and record, including three degrees from Harvard, 10 years of surgical residency training, and Board Certifications from the American Board of Surgery and the American Board of Thoracic Surgery.

105. Such prospective employer rejections of plaintiff physician include the following hospitals which accessed the NPDB report on Plaintiff physician in or about the following dates:

30

May 24, 2010 and June 1, 2010 by Reston Hospital Center in Virginia; June 27, 2011 by Baptist Regional Medical Center in Kentucky; July 25, 2011 by Natchez Regional Medical Center in Mississippi; and August 21, 2011 and March 5, 2012 by Muskogee Regional Medical Center in Oklahoma.

106.    As a result, plaintiff physician's career as a physician and surgeon in the United States has been destroyed by what he contends is a false report, maintained by defendants, without affording plaintiff any due process of law. Plaintiff's property and liberty interests in his right to practice medicine have been severely diminished and destroyed.

107.    Accordingly, under the statutes and regulations as applied to plaintiff physician in this case, plaintiffs have been deprived of their liberty and property interests in plaintiff physician's career and income by the federal defendants in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.

### THIRD CAUSE OF ACTION TO DECLARE THE HCQIA AS INTERPRETED AND APPLIED BY DEFENDANTS AS AN UNCONSTITUTIONAL BILL OF ATTAINDER

108.    Plaintiffs reallege and incorporate herein as if fully set forth, the allegations contained in paragraphs 1 through 107 of the Complaint.

109.    By reason of the foregoing, the HCQIA as enacted and administered by defendants singles out and effectively deprives a readily ascertainable group of physicians from future professional employment. This group is all those who are reported for nothing more than having resigned or surrendered clinical privileges without knowledge that they were under investigation, or were affirmatively misled as not being under investigation, when in fact they are fully competent, qualified physicians who would prove such had they been informed of the investigation and allowed to contest the charges. Such an enactment and conduct amounts to a

bill of pains and penalties and Bill of Attainder, in that the legislation as implemented inflicts punishment without a judicial trial, and is therefore prohibited by Article I, § 9 clause 3 of the Constitution.

110.   By reason of the foregoing, the HCQIA as enacted by the Congress and administered by defendants singles out and effectively deprives this readily ascertainable group of physicians, which includes competent physicians, and lists them in a manner which in purpose and effect deprives them of future employment without any notice, hearing or due process. This group of competent physicians, who have done no more than resign without knowing of an investigation, or by being affirmatively misled prior to resignation that there was no investigation, is thereby "blacklisted" from further employment in their chosen field by act of the Congress and by the defendants as they have chosen to implement the law, subjecting plaintiff and similarly situated physicians to severe deprivation without a trial or other due process. The blacklist can be facilitated by persons who are economic rivals or private enemies of the subjected physicians, who are added to the blacklist for reasons of personal dislike, discrimination, and economic competition but in cases of resignation without knowledge that they were under investigation, receive no due process, in contrast to the case where the physician knows of the investigation and can demand at least a peer review.

111.   In such cases of being blacklisted by the defendant NPDB for resigning while under an alleged investigation of which the physician was not aware, the HCQIA as implemented by defendants does not afford the branded physician any pre-listing notice, nor any trial or a hearing at which to prove that the charges of incompetence are false. This group of competent physicians suffer the elimination, or severe curtailment, of the physicians' ability and constitutional right to practice their chosen occupation as a consequence of being on the

blacklist, which is therefore an unconstitutional legislative and executive action in violation of the Constitution, Art. I, Sec. 9 clause 3.

**WHEREFORE**, plaintiffs pray for an order and judgment against defendants:

A.    Finding and declaring that the actions of defendants were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

B.    Finding and declaring that the actions of defendants in accepting and maintaining the AAR number 5500000059633157 filed against plaintiffs without affording plaintiffs adequate notice and opportunity to be heard on all the merits before the defendant agency is unconstitutional as being without Due Process and in violation of the Fifth Amendment, and in violation of Article I § 9 clause 3 of the United States Constitution;

C.    Finding and declaring that all the materials accessible on the NPDB database concerning the plaintiff physician, including the AAR number 5500000059633157, plaintiff's Subject Statement and the Secretarial Review Decision be removed from the NPDB records and all past queriers be notified of such removal and that the AAR has been withdrawn and nullified;

D.    Permanently enjoining defendants, their officers, agents, servants, employees and attorneys, and their successors, and all persons in active concert or participation with any of them, from disseminating in any way any of the information previously contained in the aforesaid materials previously accessible on the NPDB database;

E.    Awarding plaintiffs their costs and attorneys' fees to the extent allowed by law;

33

F.      Granting plaintiffs such other and further relief as the Court deems just and

proper.

SCHWARTZ & THOMASHOWER LLP


By: _William Thomashower (signature)_

William Thomashower
Rachel Schwartz
Carla Sereny

15 Maiden Lane, Suite 705
New York, NY 10038-5120
Tel. 212-227-4300

COBURN & GREENBAUM


By: _Barry Coburn (signature)_
Barry Coburn

1710 Rhode Island Avenue NW
2nd floor
Washington DC 20036
Tel. 202-657-4490


*Attorneys for Plaintiffs*

ADAM BROOK, M.D., PH.D. and
ADAM BROOK, M.D., PH.D. P.L.L.C.,

Dated: New York, New York
       July 25 2012

34