## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ADAM BROOK,** *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**JUDITH ROGERS, M.H.A.,** *et al.*,<br><br>**Defendants.** | Civil Action No.  12-01229 (TFH) |

## <u>MEMORANDUM OPINION</u>

The Health Care Quality Improvement Act requires that hospitals file a report with the Department of Health and Human Services "whenever a physician voluntarily resigns while under investigation for reasons related to his professional competence or conduct." *Long v. HHS*, 422 F. Supp. 3d 143, 145–46 (D.D.C. 2019); 42 U.S.C. §§ 11101-152. The report is then posted to the National Practitioner Data Bank, "an online database, which . . . alert[s] hospitals and other would-be employers of potential issues with the physician's credentials." *Long*, 422 F. Supp. 3d at 145–46.

This lawsuit concerns one such report about the plaintiff, Dr. Adam Brook, a surgeon formerly employed by Peconic Bay Medical Center (the "Hospital"). The Hospital submitted the report (the "Adverse Action Report") to the National Practitioner Data Bank (the "NPDB" or the "Data Bank") in 2009 after Dr. Brook resigned while the Hospital investigated an appendectomy that he performed. Dr. Brook and his limited liability company, John Doe PLLC ("the

1

plaintiffs"), sued the Secretary of the Department of Health and Human Services ("the

Secretary", "HHS", or "the Agency"), the Data Bank, and three officials who administer the Data

Bank over their maintenance and continued distribution of the Adverse Action Report.

The Court described the facts of this case in detail in *Doe v. Rogers*, 139 F. Supp. 3d 120

(D.D.C. 2015) (*"Doe"*), and includes relevant excepts below:

> On Friday, October 2, 2009, Dr. Doe commenced a late-night emergency laparoscopic appendectomy on a 14–year–old girl who had acute appendicitis. First Am. Compl. ¶¶ 48, 49; Administrative Record ("AR") 0153 [ECF No. 19–4 (Sealed)] . . . During the surgery, Dr. Doe removed what he characterized as an "inflamed band" AR 0101 [ECF No. 19–3 (Sealed)] . . . A subsequent pathology report confirmed that the "inflamed band" was part of the patient's right Fallopian tube.  First Am. Compl. ¶ 51 [ECF No. 23]; AR 0142–0143 at ¶ 85 [ECF No. 19–3 (Sealed) ] . . . There is no dispute that Dr. Doe failed to recognize the anatomical identity of the "inflamed band" before he intentionally cut and removed it. Pls.' Mem. In Opp'n to Defs.' Mot. to Dismiss 3–4 [ECF No. 45 (Sealed)] . . . .

> [The following Monday,] the Vice President of Medical Affairs told Dr. Doe that the Hospital was required to report the surgical incident to the New York State Department of Health and that such a report was necessary whenever an organ other than the organ operated is injured. AR 0161 [ECF No. 19–4 (Sealed) ]; AR 0203 [ECF No, 19–5 (Sealed)]. The hospital . . . filed a report that day via the New York Patient Occurrence Reporting and Tracking System ("NYPORTS") and stated in the report that "[t]he physician has been placed on suspension pending completion of the investigation and the family notified." AR 0108 [ECF No. 19–3 (Sealed)]. . . .

> Later that same day, Dr. Doe executed a letter voluntarily suspending his surgical privileges and stating "I will not operate at Peconic Bay Medical Center for the next two weeks effective October 5, 2009 through October 19, 2009, or until mutually agreed upon. I will however, finish the follow-up care on patients that I am currently involved with on the clinical floors without performing any surgery." AR 0110 [ECF No. 19–3 (Sealed) ]. Dr. Doe claims that this letter was prompted by his discovery "that he was going to have to return to the University of Tennessee to complete another year of cardiothoracic surgery fellowship in preparation for his Board exam." First Am. Compl. ¶ 53.

> Two days later, on October 7, 2009, Dr. Doe tendered a short letter of resignation that stated "[e]ffective October 16, 2009, I resign from Peconic Bay Medical Center." AR 0113 [ECF No. 19–3 (Sealed)].

On December 3, 2009, about two months after Dr. Doe resigned, the Hospital submitted an Adverse Action Report to the National Practitioner Data Bank. AR 0132 [ECF No. 19–3 (Sealed)]. The Adverse Action Report stated:

> In June 2009, the physician commenced practice at the Hospital in thoracic and general surgery. On Friday, October 2, 2009, the physician performed a laparoscopic appendectomy on a 14–year–old female. In the course of performing the procedure, the physician inadvertently removed part of one of the patient's fallopian lubes. On or about Monday, October 5, 2009, the physician agreed to refrain from exercising his surgical privileges pending the Hospital's investigation of this matter. By letter dated October 7, 2009, the physician advised the Hospital that he resigned from the Hospital effective October 16, 2009. Accordingly, the Hospital took no further action regarding the physician's privileges or employment. However, the Hospital's quality assurance review of this matter indicates departures by the physician from standard of care with regard to the laparoscopic appendectomy that he performed on October 2, 2009.

AR 0002 [ECF No. 19–1 (Sealed)].

. . . . Upon discovering the report, Dr. Doe contacted the Hospital and requested that it retract the report because it was factually inaccurate. AR 0008 [ECF No. 19–1 (Sealed) ]; AR 0013 [ECF No. 19–1 (Sealed)]. Dr. Doe also submitted a Subject Statement to the National Practitioner Data Bank and placed the Adverse Action Report in a disputed status "challenging both the factual accuracy of the report and whether the report was submitted in accordance with the [National Practitioner Data Bank's] reporting requirements." First Am. Compl. ¶ 89 [ECF No. 23]; *see also* AR 0018–27 [ECF No. 19–1 (Sealed)].

When the Hospital refused to revise or void the Adverse Action Report, Dr. Doe submitted a letter to the National Practitioner Data Bank requesting that the Secretary of the Department of Health and Human Services review and remove the report. First Am. Compl. ¶ 91 [ECF No. 23]; AR 0007–17 [ECF No. 19–1 (Sealed)]. On June 25, 2012, Judy Rodgers, Senior Advisor for the Division of Practitioner Data Banks at the Department of Health and Human Services, issued a Secretarial Review Decision denying Dr. Doe's request and stating that the Secretary found that "[t]here is no basis on which to conclude that the Report should not have been filed in the NPDB or that it is not accurate, complete, timely or relevant," AR 0268–73 [ECF No. 19–6 (Sealed)].

*Doe*, 139 F. Supp. 3d at 129-31.

One month later, the plaintiffs filed this lawsuit alleging that the defendants violated the Administrative Procedures Act ("APA"), sections 522a(g)(1)(A) and (C) of the Privacy Act, and the plaintiffs' constitutional rights. *Doe*, 139 F. Supp. 3d at 132. After the parties filed dispositive motions (the "first round of briefing"), the Court granted the defendants' motion for summary judgment on the APA claims except as to the narrow question of whether the statement in the Adverse Action Report that "'the Hospital's quality assurance review of this matter indicates departures by the physician from standard of care with regard to the laparoscopic appendectomy that he performed on October 2, 2009'" ("the Statement") was reportable to the Data Bank. *Id*. at 153 (quoting ECF No. 19-1 [SEALED]). The Court dismissed the plaintiffs' constitutional claims and the § 552a(g)(1)(C) Privacy Act claim, but declined to dismiss the plaintiffs' contention that the Secretary violated § 552a(g)(1)(A) of the Privacy Act because the Court remanded the reportability issue to the Agency. *Id*. at 167-68; 170.

The Agency has since issued its decision on remand, and concluded that the Statement is reportable. [ECF No. 86-1 (Sealed)]. That decision is the main subject of the motions now pending before the Court, which include the defendants' renewed motion to dismiss or, in the alternative, motion for summary judgment [ECF No. 100], and the plaintiffs' cross-motion for summary judgment and opposition to the defendants' motion [ECF No. 103]. Also pending before the Court are three additional motions filed by the plaintiffs—two motions to supplement the record, [ECF Nos. 118 & 120], and a motion for reargument and for the Court's recusal, [ECF No. 127]. The defendants have opposed each motion. [ECF Nos. 119, 122 & 128].

## I.    Regulatory Background

Congress enacted the Health Care Quality Improvement Act (the "Act" or "HCQIA") to address the "increasing occurrence of medical malpractice" and "the need to restrict the ability of

incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(1)-(2). The Act requires health care entities to report to HHS when *inter alia*, they "accept[] the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." *Id*. § 11133(a)(1)(B)(i); *see also* 45 C.F.R. § 60.12(a)(1)(ii)(A).

When filing reports, the Act requires that health care entities submit  "(A) the name of the physician or practitioner involved, (B) a description of the acts or omissions or other reasons for the action or, if known, for the surrender, and (C) such other information respecting the circumstances of the action or surrender as the Secretary deems appropriate." 42 U.S.C. § 11133(a)(3). According to the legislative history, this section "does not necessarily require an extensive description of the acts or omissions or other reasons for the action or, if known, for the surrender. It does, however, require sufficient specificity to enable a knowledgeable observer to determine clearly the circumstances of the action or surrender." H.R. Rep. No. 99-903 at 15 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6398. The implementing regulations issued by the Secretary likewise require that entities report "a description of the acts or omissions or other reasons for privilege loss, or, if known, for surrender," the "action taken, date the action was taken, and effective date of the action" and other information the Secretary may require "after publication in the Federal Register and after an opportunity for public comment." 45 C.F.R. § 60.12(a)(3).

II.     **The Plaintiffs' Remanded Administrative Procedures Act Claim**

    a.     **The Secretary Found that the Statement was Reportable.**

In its decision on remand, the Secretary concluded that the Statement was reportable and denied the plaintiffs' request to strike it from the Adverse Action Report. [ECF No. 86-1 at 2 (SEALED)]. The Secretary found that the Statement "provides a more complete history of the events relevant to [Dr. Brook's] resignation while under investigation." *Id*. at 2. According to the Secretary, while Dr. Brook's "report was based on a resignation while under investigation and was not dependent on the results of the investigation," the results "are closely related to the reportable event," put queriers on "better notice of the facts and circumstances of the reported action," and "are clearly types of information that could assist further queriers in making privileging and licensing decisions." The Secretary emphasized that "[o]ne of the central purposes of the NPDB is to provide health care entities with better information on which to make licensing and privileging decisions." *Id*.

The Secretary also found that the Act and its implementing regulations require the reporting, if known, "of the reasons for the surrender," and concluded that "the results of an investigation could be useful information for future queriers in determining the reasons for surrenders." *Id.* The Secretary went on to note that "[i]f, for instance, an investigation exonerates practitioner from any wrongdoing, a querier may determine that this provides further evidence that a practitioner's resignation was not motivated by a desire to escape punishment." *Id*.

    b.     **Summary Judgment Standard**

The plaintiffs seek review of the Secretary's decision under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*. "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record

and consistent with the APA standard of review." *Chiayu Chang v. USCIS,* 289 F. Supp. 3d 177, 182 (D.D.C. 2018) (internal quotations omitted). When considering challenges to agency action under the APA, instead of applying Federal Rule of Civil Procedure 56(a)'s summary judgment standard, "the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotations omitted).

The APA requires courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action that 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise' is arbitrary and capricious." *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020) (quoting *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "The scope of review under the 'arbitrary and capricious' standard is narrow, and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

### c.    The Secretary's Decision was not Arbitrary and Capricious.

#### i.    The Statement is Reportable Under the Statute.

In the amended complaint and first round of briefing, the plaintiffs argued that the Statement was not reportable because the Hospital's investigation did not result in the suspension of Dr. Brook's privileges. *See Doe*, 139 F. Supp. 3d at 132 (identifying the fifth APA argument raised by the plaintiffs as the assertion that "the Hospital's quality assurance review was not a reportable event because it did not result in the suspension of Dr. Brook's privileges given that he had already resigned."); First Am. Compl. ¶¶ 120-125 [ECF No. 23]; Pls.' Opp'n to Defs.'

Mot. to Dismiss at 47 [ECF No. 45 (SEALED)]; Pls.' Reply at 23 [ECF No. 56 (SEALED)]. The

Court concluded that the Secretary did not address this argument, "likely because Dr. [Brook]

raised it so obliquely . . . that it may not have seemed apparent," and remanded the issue for the

Secretary's consideration. *Doe*, 139 F. Supp. 2d at 153; *see id*. at 170 ("remand[ing] to the

Secretary to consider whether the statement that 'the Hospital's quality assurance review of this

matter indicates departures by the physician from standard of care with regard to the

laparoscopic appendectomy that he performed on October 2, 2009' is reportable.") (quoting AR

0002 [ECF No. 19-1 (Sealed)]).

The plaintiffs do not address this argument in their filings, and appear to have altogether

abandoned this claim—a curious position given that it was the subject of the Court's remand to

the Agency.  The plaintiffs also do not respond to the Secretary's argument that the Statement is

reportable pursuant to two of the Act's provisions. Defs.' Mot. Summ. J. at 9 [ECF No. 100]

(citing 42 U.S.C. § 11133(a)(3)(B)-(C)). Accordingly, the Court could properly treat the

plaintiffs' argument that the Statement was not reportable under the Act as conceded. *See, e.g.,*

*Wilson v. Fed. Express Corp.*, No. 18-cv-485, 2019 WL 5696874, at *1 (D.D.C. Nov. 4, 2019)

("When a party responds to some but not all arguments raised on a Motion for Summary

Judgment, a court may fairly view the unacknowledged arguments as conceded.") (internal

quotations marks omitted).

Even if the Court must consider whether the Act allowed the Hospital to report the results

of its investigation, *cf Winston & Strawn LLP v. McLean*, 843 F.3d 503, 508 (D.C. Cir. 2016),

the Court finds that it unambiguously does. The statute requires that when reporting entities

"accept[] the surrender of clinical privileges of a physician while the physician is under an

investigation," they submit a "description of the acts or omissions or, if known, the reason for the

surrender."  42 U.S.C § 11133(a)(1)(B)(i); (a)(3). An "act" is defined as "[s]omething done or performed, esp. voluntary; a deed." Black's Law Dictionary (11th ed. 2019).  A "description" is a "delineation or explanation of something by an account setting forth the subject's characteristics or qualities." *Id*. Putting these definitions together, the statute requires a "delineation or explanation" of "something done or performed"—which in this case means a delineation or explanation of the Hospital's acceptance of Dr. Brook's resignation while he was under investigation.

This broad language indicates that the Act provides reporting entities space to include information that it does not explicitly identify in the statute, such as the results of an investigation. This interpretation is supported by the statute's purpose and legislative history. *See Doe*, 139 F. Supp. 3d at 127 (finding that the Act aims to address the "need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance") (quoting 42 U.S.C. § 11101(1)-(2)); *Doe* 139 F. Supp. 3d at 145 (finding that the Act "clearly manifests a policy that favors strict reporting in the event of a resignation during an investigation to ensure patients are protected and to prevent physicians from skirting peer review"); H.R. Rep. No. 99-903 (stating that § 11133(a)(3) of the Act "does not necessarily require an extensive description of the acts or omissions or other reasons for the action or, if known, for the surrender. It does, however, require sufficient specificity to enable a knowledgeable observer to determine clearly the circumstances of the action or surrender."). Providing the results of the investigation enables queriers to more fully understand the circumstances of the incident, and protects patients by providing entities with enough information to make informed hiring decisions. The statute unambiguously allows the Hospital to provide a one-sentence description of the results of their

investigation.[1] *See Nat'l Ass'n of Clean Air Agencies v. E.P.A.*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (*quoting Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984)) (stating that if after "examin[ing] a statute *de novo*, 'employing traditional tools of statutory construction,'" the court finds that the "'intent of Congress is clear,'" it "accord[s] the agency's interpretation [of a statute] no deference, 'for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'").

      ii.      The Secretary Did Not Conclude that Dr. Brook Resigned to Escape Punishment.

The plaintiffs challenge the Agency's conclusion that "[t]he results of an investigation could be useful information for future queriers in determining the reasons for surrenders." [ECF No. 86-1 at 2 (SEALED)]; *see also id.* ("[i]f, for instance, an investigation exonerates a practitioner from any wrongdoing, a querier may determine that this provides further evidence that a practitioner's resignation was not motivated by a desire to escape punishment."). The plaintiffs describe this conclusion a "classic bootstrap argument" that is "devoid of logic" because it assumes that a practitioner will know the results of a hospital's investigation before it is concluded. Pls.' Opp'n & Cross Mot. Summ. J. at 12 [ECF No. 103]. They also contend that the Secretary concluded that Dr. Brook resigned to escape punishment, even though Dr. Brook

---

[1] The Secretary makes broader arguments about the Act's scope in its briefs than it did in its decision on remand. *Compare* Defs.' Mot. at 9 (arguing that the Statement falls clearly under 42 U.S.C. § 11133(a)(3)(B)-(C) *with* [ECF No. 86-1 at 2 (SEALED)] (finding the Statement reportable because the Statute requires that entities report the reasons for the surrender, if known, and "the results of an investigation could be useful information for future queries in determining" those reasons, and because the results of the investigation are "closely related to the reportable event."). Because the Act clearly allows the Hospital to report the results of the investigation, the Court does not defer to the Secretary's interpretation of the Act, and does not need to address this delta between the decision on remand and the briefs.

claims that he resigned before the Hospital completed its investigation to complete an additional year of surgery training in Tennessee. *Id*. at 12-13.

Contrary to the plaintiffs' assertions, the Secretary's decision on remand did not conclude that Dr. Brook left the Hospital in order to escape punishment. It did not even address Dr. Brook's reasons for resigning.[2] The Secretary's example does imply that a physician will know whether he departed from the standard of care in a given procedure, which could prompt him to resign before an investigation is complete. That is not an irrational notion, although a physician won't necessarily know what a hospital will conclude in this regard. Regardless, as the defendants note, HHS did not find that the results of an investigation are a clear indication of the reasons for a surrender, or that Dr. Brook resigned because he knew the Hospital would find that he departed from the standard of care. The Secretary simply concluded that the results "may provide further relevant information about the surrender." Defs.' Opp'n and Reply at 6 [ECF No. 105]. That conclusion does not render the Secretary's opinion arbitrary and capricious.

      iii.     The Court Rejected the Plaintiffs' Arguments About the Hospital's Procedures and Findings in *Doe*.

The plaintiffs spend much of their briefing challenging the Hospital's investigation and findings that he departed from the standard of care. *See, e.g.,* Pls.' Cross Mot. & Opp'n at 4-5, 7-9, 11 [ECF No. 103]. Their discontent with the Hospital's procedures and dispute with its conclusions is not grounds for finding that the Secretary's decision was arbitrary and capricious.

---

[2] The plaintiffs also allege that the Secretary accepted the Hospital's conclusion that Dr. Brook departed from the standard of care. The Secretary's decision on remand did not address that issue. In its previous decision, which is not currently before the Court, the Secretary explicitly stated that he made "no finding" concerning "whether [Dr. Brook] met the standard of care." AR 0257 [ECF No. 19-6 (SEALED)]. The Secretary did find that "it is clear from the record that PBMC determined that [Dr. Brook] departed from the standard of care," and concluded that it was "poorly positioned to question a health care entities' conclusion" in this regard. *Id*.

As the Court discussed in *Doe*, "the Secretary's review of information in the Data Bank is limited in scope." *Doe*, 139 F. Supp. 3d at 149 (quoting *Leal v. Sec'y, HHS*, 620 F.3d 1280, 1284 (11th Cir. 2010)). "[T]he statute limits the Secretary's regulatory authority to providing procedures to dispute the accuracy of the reported information but nowhere does the statute authorize, or even contemplate, that the Secretary will actually adjudicate the underlying merits of the events, professional review actions, activities, findings, or determinations." *Doe,* 139 F. Supp. 3d at 148; *see also Leal*, 620 F.3d at 1284 ("[t]he Secretary does not act as a factfinder deciding whether incidents listed in the report actually occurred or as an appellate body deciding whether there was sufficient evidence for the reporting hospital to conclude that those actions did occur.").

As the defendants contend, in *Doe*, the Court considered the plaintiffs' arguments regarding the nature of the Hospital's investigation into the surgical incident. The Court concluded that the Hospital embarked on a "systematic examination of Dr. Doe's conduct relating to the surgical incident by gathering the necessary documentation, conferring with the relevant Hospital executives, meeting with the physicians who were involved, reporting the incident to the state health department, and organizing a team to conduct a Root Cause Analysis." *Doe*, 139 F. Supp. 3d at 138. The Court also found that the plaintiffs' allegations that there was "no documentation of an October meeting of the Root Cause Analysis Committee" and that "individuals identified as being in attendance at the Root Cause Analysis Committee meeting were not there" were "not well founded or supported." *Id*. at 139; *see also id*. at 142-143.  The Court's rulings are the law of the case; the Court will not revisit them. *See United States v. Kpodi*, 888 F.3d 486, 491 (D.C. Cir. 2018) (the law-of-the-case doctrine "prevents courts from reconsidering issues that have already been decided in the same case" and "is

predicated on the premise that it would be impossible for an appellate court to perform its duties satisfactorily and efficiently and expeditiously if a question, once considered and decided by it, were to be litigated anew in the same case upon any and every subsequent appeal.") (internal quotation marks omitted and edits accepted).

## III.    The § 552a(g)(1)(A) Privacy Act Claim

The plaintiffs allege that the defendants have violated § 552a(g)(1)(A) of the Privacy Act by failing to amend the Adverse Action Report. They argue that the Adverse Action Report contains "errors of fact, not judgment" that should be corrected pursuant to the Privacy Act, including whether the Hospital lied about meetings and committed fraud by tricking Dr. Brook into resigning. Pls.' Cross Mot. & Opp'n at 47. The plaintiffs allege that the following facts support their claims: 1) the Hospital submitted a redacted and incomplete document as proof of an October 2009 meeting of the Hospital's Medical Staff Performance Improvement Committee, Am. Compl. ¶ 63; 2) the Hospital misdated a memorandum documenting a review meeting on Monday, October 6, 2009, *Id.*; 3) neither the Attending Gynecology Oncology Surgeon nor the Attending General/Thoracic Surgeon attended an October 14, 2009 meeting of a Root Cause Analysis Committee, *Id.* ¶ 65; and 4) three surgeons who were not involve with the Hospital's review concluded that Dr. Brook did not depart from the standard of care, *id.* ¶ 80. According to the plaintiffs, this evidence demonstrates that the Hospital fabricated documents in support of a quality assurance review of the plaintiffs' surgical conduct that did not actually occur. *Id.* ¶ 58.

The defendants have again moved to dismiss this claim pursuant to Federal Rule of Civil Procedure 12(b)(6). They assert that the Statement was an opinion, not a fact, and that § 552a(g)(1)(A) of the Privacy Act does not provide for the amendment of opinions or judgments. According to the defendants, there "can be no plausible dispute that [the Hospital] concluded that

he deviated from the standard of care, and that fact is all the [Adverse Action Report] relates." Defs.' Opp'n and Reply at 11. They also contend that the Court has already determined that the record does not support the plaintiffs' allegations that the Hospital fabricated documents or that its administrators committed fraud. *Id*. at 10.

#### a.   Legal Standard

##### i.   Motion to Dismiss

A complaint "must contain . . .  a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss based on Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When ruling on a motion to dismiss, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Banneker Ventures v. Graham,* 798 F.3d 1119, 1129 (D.C. Cir. 2015). The Court may consider facts alleged in the complaint, as well as "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (internal quotation marks omitted and edits accepted).

ii.        § 552a(g)(1)(A) of the Privacy Act

Under the Privacy Act, an "agency that maintains a system of records" shall permit individuals "to request amendment of a record pertaining" to him or her. 5 U.S.C. § 552a(d)(2). Upon receiving such a request, an agency may either correct any portion of that record, or inform the individual of its refusal to do so, and provide, *inter alia*, the reason for the refusal. *Id*. § 552a(d)(2)(B). The Privacy Act requires that an agency "permit" an individual "who disagrees with the refusal of the agency to amend his record" to request a review of that decision. *Id*. at § 552a(d)(3). Section 552a(g)(1)(A) of the Privacy Act—the subsection at issue here—then provides that "[w]henever an agency . . . makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection," the individual may "bring a civil action against the agency . . ." 5 U.S.C. § 552a(g)(1)(A).

**b.      The Plaintiffs have Failed to State a Claim under 5 U.S.C. § 552a(g)(1)(A).**

Accepting the plaintiffs' aforementioned factual allegations as true, their Privacy Act claim does not survive a motion to dismiss because the Statement is the Hospital's judgment about Dr. Brook's conduct during the surgery.[3] "It is well-established that, 'generally speaking,

---

[3] The defendants correctly note that the Court considered the plaintiffs' allegations in the context of their APA claims and found them unavailing. *See Doe*, 139 F. Supp. 3d at 139-140 (finding that there was "no other evidence in the administrative record to buttress the plaintiffs' allegations that the defendants' typographical errors should be attributed to document fabrication," that the Court was "not troubled by the fact the minutes of the Medical Staff Performance Improvement Committee meeting were redacted" because "[a]s far as the Court can tell, the only thing of any consequence that was redacted in the document was the identity of Hospital employees"); *id.* at 143 (concluding that the "fact that [Dr. Ortiz] might not have attended the Root Cause Analysis Committee meeting, alone, is an insufficient basis for the Secretary to conclude that the meeting was 'non-existent' so the Adverse Action Report must be stricken"). However, when considering the defendants' motion to dismiss the remaining Privacy Act claim, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Banneker Ventures,* 798 F.3d at 1129.

the Privacy Act allows for correction of facts but not correction of opinions or judgments.'"

*Mueller v. Winter*, 485 F.3d 1191, 1197 (2007) (quoting *McCready* v. *Nicholson*, 465 F.3d 1, 19

(D.C. Cir. 2006)). It is true that "[i]f a subjective judgment is 'based on a demonstrably false'

factual premise . . . the Privacy Act compels the agency to correct or remove the judgment from

the complaining individual's record." *Mueller*, 485 F.3d at 1197 (*quoting White v. Office of Pers.*

*Mgmt.*, 787 F.2d 660, 662 (D.C. Cir. 1986)). But the plaintiffs do not point to a demonstratively

false factual premise that would compel the Agency to correct or remove the Statement.

Accepting the plaintiffs' factual allegations as true and granting reasonable inferences in their

favor, the plaintiffs' allegations call into question the rigor of the Hospital's review of Dr.

Brook's work, and its documentation of that review.[4] However, it would be unreasonable for the

Court to infer from the plaintiffs' allegations that a review of his conduct did not occur, or that

the Hospital did not conclude that he departed from the standard of care. Dr. Brook conducted an

appendectomy. First Am. Compl. ¶ 49. During the course of that appendectomy, he removed an

inflamed band that was identified by a subsequent pathology report as part of the patient's right

Fallopian tube. *Id*. ¶ 51. The Hospital conducted a review of the procedure and reported to the

Agency that it concluded that Dr. Brook's conduct departed from the standard of care. *Id*. ¶¶ 57;

61-65. That statement is a "classic statement of an author's subjective judgment about an

individual's performance." *Mueller*, 485 F.3d at 1197. For that reason, the defendants' motion to

dismiss the remaining Privacy Act claim will be granted.

## IV.    The Court will Not Consider the Plaintiffs' Additional Claims.

In their motion, the plaintiffs raise a slew of other issues that the Court has either already

adjudicated, or that are not properly before the Court given the discrete issue on remand. The

---

[4] Although the Court accepts the plaintiffs' well-plead factual allegations as true, the Court does not
accept as true the plaintiff's allegations of fraud, which are legal conclusions. *Iqbal*, 556 U.S. at 678.

plaintiffs raise a series of constitutional claims. *See, e.g.,* Pls.' Cross Mot. & Opp'n at 15-28 (raising constitutional violations under the APA and the Fifth Amendment, including alleging that Dr. Brook has been "deprived of [his] fundamental right to practice [his] chosen profession."). The Court already adjudicated the plaintiffs' constitutional claims and will not revisit those rulings. *See Doe,* 139 F. Supp. 3d at 153-167 (considering plaintiff' Due Process claims); 168-69 (Bill of Attainer claims); 169-171 (Eight Amendment claims); *Kpodi*, 888 F.3d 486, 491 (D.C. Cir. 2018) (the law-of-the-case doctrine "prevents courts from reconsidering issues that have already been decided in the same case.") (internal quotation marks omitted).

The plaintiffs also cite three additional Privacy Act sections that are not properly before the Court and that the plaintiffs did not raise in their Amended Complaint. Pls.' Cross Mot. & Opp'n at 35-45 (citing 5 U.S.C. §§ 552a(e)(2), (e)(5) and (e)(6)). Although a court errs when it "fail[s] to consider a *pro se* litigant's complaint in light of all filings," the plaintiffs were represented by counsel when they filed their Amended Complaint and during the first round of briefing. *Brown v. Whole Foods Mkt. Grp.,* 789 F.3d 146, 152 (D.C. Cir. 2015) (internal quotation marks omitted). Accordingly, the Court will not consider the plaintiffs' new Privacy Act arguments.

The plaintiffs also argue that the Court must accept the plaintiffs' factual allegations as true regarding all their claims and allow them to proceed to discovery. Pls.' Reply at 4-8 [ECF No. 108]. Not only do the plaintiffs seek to relitigate the standard that the Court has already applied to its APA claims in *Doe*, this argument also misstates the standard of review for APA claims, which the Court has previously discussed. *See supra* § II(b).

### V.      The Plaintiffs' Requests to Add Extra-Record Evidence

The plaintiffs have filed two motions to supplement the record, along with a motion for reargument based on new evidence.

### a.      Legal Standard

"When reviewing agency action under to the APA," courts "review 'the whole record or those parts of it cited by a party.'" *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (quoting 5 U.S.C. § 706). "The record consists of the order involved, any findings or reports on which that order is based, and the pleadings, evidence, and other parts of the proceedings before the agency." *Id.* (internal quotation marks omitted). It is "black-letter administrative law that in an Administrative Procedure Act case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" *CTS Corp. v. EPA.,* 759 F.3d 52, 64 (D.C. Cir. 2014) (quoting *Hill Dermaceuticals, Inc. v. FDA,* 709 F.3d 44, 47 (D.C. Cir. 2013) (internal edits accepted). An agency is "entitled to a strong presumption of regularity that it properly designated the administrative record." *Oceana v. Pritzker*, 217 F. Supp. 3d 310, 316 (D.D.C. 2016) (internal quotation marks omitted). For that reason, "[s]upplementation of the administrative record is the exception, not the rule." *Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006).

There are two ways a plaintiff may seek to augment the body of materials reviewed by the district court in an APA case, both of which are often, and confusingly, referred to as "supplementing" the administrative record.  *Am. Petroleum Tankers Parent v. United States*, 952 F. Supp. 2d 252, 261 (D.D.C. 2013). First, a party may seek to "add[] to the volume of the administrative record with documents the agency considered." *Earthworks v. United States Dep.'t of the Interior*, 279 F.R.D. 180, 185 (D.D.C. 2012); *see also Am. Petroleum Tankers*

*Parent*, 952 F. Supp. 2d at 261 (describing this supplementation as seeking to "include evidence that should have been properly a part of the administrative record but was excluded by the agency.") (internal quotation marks omitted). Second, a party may seek to add extra-record evidence that was "not initially before the agency but that the plaintiff believes should nonetheless be included in the administrative record." *Am. Petroleum Tankers Parent*, 952 F. Supp. 2d at 261 (internal quotation marks omitted).

Under the first justification for supplementing the record, more accurately described as completion of the administrative record, "the moving party must rebut the presumption of administrative regularity and show that the documents to be included were before the agency decisionmaker." *Pac. Shores Subdivision*, 448 F. Supp. 2d at 6; *see also Oceana*, 217 F. Supp. 3d at 316 ("the party seeking completion must present non-speculative, concrete evidence to support their belief that the specific documents allegedly missing from the administrative record were directly or indirectly considered by the actual decision makers involved in the challenged agency action.") (internal quotation marks omitted).

Under the second justification, courts generally do not allow parties to add extra-record evidence "unless they can demonstrate unusual circumstances justifying a departure from this general rule." *Am. Wildlands*, 530 F.3d at 1002 (internal quotation marks omitted). The record "can be supplemented in three instances: (1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information was needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'" *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Am. Wildlands*, 530 F.3d at 1002); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)

("The APA limits judicial review to the administrative record except when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.") (internal quotation marks omitted). These "narrow" exceptions may "at most . . . be invoked to challenge gross procedural deficiencies." *Hill Dermaceuticals*, 709 F.3d at 47. Because the plaintiffs seek to supplement the administrative record with documents that were not before the Agency, the Court will analyze the plaintiffs' requests as requests to add extra-record evidence.

  **b.**  **The Plaintiffs' Second Motion to Supplement the Record**

  In the plaintiffs' Second Motion to Supplement the Record, they seek to add a June 2011 letter sent by plaintiffs' then-counsel to the Data Bank attaching a complaint the plaintiffs had filed in the Eastern District of New York in 2010. Pls.' Second Mot. to Suppl. R., Ex. 1 [ECF No. 118-1]. Portions of that complaint are already in the record, AR at 140-45 [ECF No. 19-3 (SEALED)], but the plaintiffs seek to add the entire complaint to the record to demonstrate that they alleged to the Agency that the Hospital committed fraud. Pls.' Second Mot. to Suppl. R. at 5-6. In doing so, the plaintiffs seek to dispute this Court's conclusion in *Doe* that Dr. Brook "never alleged during the Secretarial review process that his resignation was not 'voluntary' because it was procured by fraud, and, moreover, the Administrative Record is devoid of evidence sufficient to establish the elements of such a claim." *Doe*, 139 F. Supp. 3d at 149. Attempting to relitigate issues that the Court has already resolved does not fall under the unusual circumstances required to add extra-record evidence. The Court will deny this motion.

  **c.**  **The Plaintiffs' Third Motion to Supplement the Record**

  The plaintiffs also seek to supplement the administrative record with documents related to what they allege was the Hospital's improper access to the plaintiff's Data Bank file in 2010.

Pls.' Third Mot. to Suppl. R. at 1 [ECF No. 120]. The first document contains email correspondence between individuals at the NPDB in 2012. *Id*. at 21-23 (Ex. 1). The correspondence indicates that when querying Dr. Brook's file in June of 2010, the Hospital selected "Privileging or Employment" as the reason for the inquiry. *Id*. at 23. The second document is a letter dated October 12, 2012 from a staff member at the NPDB to the Vice President of Medical Affairs at the Hospital concluding that the Hospital's explanation for querying Dr. Brook's file was "supported by the record and [was] consistent with the confidentiality restrictions." *Id*. at 25 (Ex. 2). The final document contains June 2012 email correspondence between HHS employees speaking disparagingly about Dr. Brook. *Id*. at 26-27 (Ex. 3).

The Secretary's adjudication of the plaintiffs' allegations is not before the Court in this litigation. However, by seeking to supplement the record with the first two documents, the plaintiffs attempt to connect the Hospital's query of Dr. Brook's Data Bank file to the Agency's alleged bias against Dr. Brook in this litigation. Pls.' Third Mot. to Suppl. R. at 9. The plaintiffs allege that 1) the Hospital's query of Dr. Brook's Adverse Action Report was unauthorized; 2) the Hospital lied to the Data Bank when selecting its reasons for the inquiry and later asserting that it queried the file because it did not save a copy of the Adverse Action Report it submitted to the Hospital; and 3) the Data Bank's acceptance of that lie demonstrates its bias against Dr. Brook in "every single decision the [A]gency makes" despite evidence to the contrary. Pls.' Reply in Supp. of Third Mot. to Suppl. R. at 13-15 [ECF No. 123].

The plaintiffs do not demonstrate how their request falls into any of the three narrow exceptions to the presumption that the Agency has properly designated the administrative record. They do not argue that the Agency excluded documents adverse to its decision; indeed, these

documents do not address the decision at issue in this case. They do not argue that these emails provide background information to allow the Court to determine if the Agency considered relevant factors. They also do not contend that supplementing the record with these documents is appropriate because judicial review of the agency's action has been frustrated by the Agency's failure to explain its actions. *City of Dania Beach*, 628 F.3d at 590. These allegations are unsubstantiated and only tenuously relate to the issues before the Court. They do not demonstrate that the Agency is biased, and fall far short of the strong showing of bad faith necessary to support supplementation of the record with extra-record evidence. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514.

The plaintiffs also argue that the Agency's decisions demonstrate a "practice and pattern" of bias against them. Pls.' Reply in Supp. of Third Mot. to Suppl. R. at 5. In doing so, they largely re-argue claims that this Court already considered in *Doe*, such as whether the Vice President of Medical Affairs tricked Dr. Brook into thinking he was not under investigation, and whether the Hospital fabricated the documents it submitted to the Agency. *See, e.g., id*. at 22; *Doe*, 139 F. Supp. 3d at 145 (addressing the plaintiffs' "new theory" that Dr. Brook's resignation was not voluntary because it was induced by fraud); *id*. at 139-140 (finding that the Secretary reasonably relied on documents the plaintiffs alleged were "forged or not bona fide"). The plaintiffs disagree with the Agency's decisions. But "[d]isagreement with an agency's analysis is not enough to warrant the consideration of extra-record evidence." *Standing Rock Sioux Tribe v. U.S. Army Corp of Engineers*, 255 F. Supp. 3d 101, 125 (D.D.C. 2017).

Finally, the Court considered and denied the plaintiffs' request to supplement the administrative record with Exhibit 3 when it denied a previous motion to supplement the record during a telephone hearing. Minute Entry, May 16, 2016. At that time, the Court expressed

dismay at the unprofessional nature of the emails, but found that they did not warrant supplementing the administrated record. That ruling is the law of the case, and the Court shall not disturb it. *See LaShawn A. v. Barry,* 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("the law-of-the-case doctrine[ ] [provides that] the same issue presented a second time in the same case in the same court should lead to the same result.").

### d.  The Plaintiffs' Motion for Reargument Based on New Evidence

The plaintiffs have moved for reargument based on what they assert is new evidence obtained in 2016 from the plaintiffs' separate litigation against the Hospital in New York state court. Pls.' Mot. for Rearg. [ECF No. 127]. They seek to add to the record the following documents: the second two pages of the "Quality Management Case Report" submitted to the Agency by the Hospital, *id.* Ex. 2 [ECF No. 127-3], the 2009 Summary Report for Sentinal Event, *id.* Ex. 3 [ECF No. 127-4], and deposition testimony from the Hospital's then-Vice President for Quality Management, *id.* Ex. 4 [ECF No. 127-5]. The plaintiffs rely on these documents to support their assertions that Hospital employees lied on documentation the Hospital submitted to the Agency, and that the Agency consequently relied on incomplete documents. *See, e.g., id.* at 2-12

These documents were not available to the Agency when it issued its two decisions—the plaintiffs obtained the documents in December 2016, over a year after the Agency issued its most recent decision in this case. Defs.' Opp'n to Mot. for Rearg. at 4 [ECF No. 128]. Although Agency counsel told the plaintiffs the Agency would consider the documents, the plaintiffs declined to submit them to the Agency before filing them before the Court. *Id.* at 5. The plaintiffs contend that forcing them to present the documents to the Agency first will cause further,

unnecessary delays. They also argue that the Agency will rule against them "because of its bias." Pls.' Reply in Supp. of Mot. for Rearg. at 3 [ECF No. 129].

By attempting to submit new evidence directly to the Court, the plaintiffs request that the Court bypass the Agency, review the documents they've submitted, and find that the Adverse Action Report should be struck from the Data Bank. But courts allow litigants to submit extra-record evidence in APA cases to more effectively review agency action, not to allow litigants to bypass agency review. *See Marcum v. Salazar*, 751 F. Supp. 2d 74, 79 (D.D.C. 2010) (noting that "'particularly in the procedural context, it may sometimes be appropriate to resort to extra-record information to *enable judicial review to become effective.*'") (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C. Cir. 1989) (edits accepted). The Agency did not have the documents that the plaintiffs seek to add to the record when it made its decisions, and, as the Court has already emphasized, it should "have before it neither more nor less information than did the agency when it made its decision." *CTS Corp.,* 759 F.3d at 64 (quoting *Hill Dermaceuticals,* 709 F.3d at 47). The Court will not consider these documents before the Agency has reviewed them. *See Butte Cty., California v. Chaudhuri,* 197 F. Supp. 3d 82, 91 (D.D.C. 2016), *aff'd*, 887 F.3d 501 (D.C. Cir. 2018) (denying a motion to add extra-record evidence and noting that "the purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review.") (internal quotation marks omitted and edits accepted). For those reasons, the plaintiffs request for reargument will be denied.

## VI.     The Plaintiffs' Request for the Court's Recusal

Finally, the plaintiffs request that the Court recuse itself from this case. They argue that the Court has shown bias against them by making incorrect legal rulings, and because of the

"unusually long time to issue decisions in this case." Pls.' Mot. for Rearg. at 31-33. The defendants oppose the request. Defs.' Opp'n to Mot. for Rearg. at 13-15.

### a.    Legal Standard

A judge "shall disqualify himself [or herself] in any proceeding in which his impartiality might be reasonably questioned." 28 U.S.C. § 455(a)[5]. He shall also disqualify himself "where he has personal bias or prejudice concerning a party." 28 U.S.C. § 455(b)(1). "The standard for disqualification under § 455(a) is an objective one. The question is whether a reasonable and informed observer would question the judge's impartiality." *In re Brooks*, 383 F.3d 1036, 1043 (D.C. Cir. 2004) (quoting *United States* v. *Microsoft*, 253 F.3d 34, 114 (D.C. Cir. 2001)).

Recusal is limited to "truly extraordinary cases" where "the judge's views have become 'so extreme as to display clear inability to render fair judgment.'" *Cobell v. Kempthorne*, 455 F.3d 317, 332 (D.C. Cir. 2006) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)). "There is a presumption against disqualification and the moving party must demonstrate by clear and convincing evidence that disqualification is required by Section 455(a)." *Walsh v. FBI*, 952 F. Supp. 2d 71, 75 (D.D.C. 2013) (citation omitted). "While judicial rulings can be evidence of prejudice in certain instances . . . unfavorable judicial rulings alone almost never constitute a valid basis for reassignment." *United States v. Hite*, 769 F.3d 1154, 1172 (D.C. Cir. 2014).

### b.    Recusal is Not Warranted.

The plaintiffs assert that the Court made two errors in its previous rulings that demonstrate bias. First, they argue that the Court has shown bias by "holding" that "the right to practice a lawful profession has never been recognized in federal jurisprudence." Pls.' Mot. for Rearg. at 33. Second, they allege that the Court "erred in its belief" that the Hospital's Vice

---

[5] Although they do not specifically cite this statute, the Court will evaluate the plaintiffs' request under 28 U.S.C § 455, which governs the recusal of federal judges.

President of Medical Affairs mistakenly told Dr. Brook that the Hospital commenced an investigation only to comply with the Hospital's reporting duty to state regulators. *Id*. at 32.

Not only are the plaintiffs' characterizations of the Court's findings incorrect, they do not provide any evidence to support their assertion that these supposed errors demonstrate bias.[6] Error alone "is by itself hardly a basis for imputing bias or even the appearance of partiality." *Hite*, 769 F.3d at 1172 (citation omitted). The plaintiffs also allege, without support, that the Court has inserted its personal views in its decisions. Pls.' Reply in Supp. of Mot. for Rearg. at 2 [ECF No. 129] (asserting that the litigation's outcome "is only possible because of this Court's seeking to impose its personal view that it is better to sacrifice a few physicians who were denied due process and were victims of sham peer review than to risk subjecting the NPDB system to challenge.").[7] However, the "opinions formed by the judge on the basis of facts introduced or events occurring in the course of . . . proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. Rather than demonstrating that the Court is biased against the plaintiffs, it appears instead that they are dissatisfied with the Court's rulings in this case, and conclude, without support, that the rulings stem from bias. Their dissatisfaction is "proper grounds for appeal, not recusal." *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 151 (D.C. Cir. 2015) (quoting *Cobell*, 455 F.3d at 331).

---

[6] For example, the Court found that the right to practice a chosen profession was not a fundamental right that triggered the heightened review of strict scrutiny and instead applied "rational basis review" to analyze the plaintiffs' Due Process claims. *Doe*, 139 F. Supp. 3d at 157.

[7] In other filings to the Court, the plaintiffs assert, again without support, that "it seems to me the Court used contorted reasoning to rule against me," and "the sooner this case gets before justices without indulgence towards the Government and its bureaucracy, the sooner justice will be had." Pls.' Reply in Supp. of Cross Mot. & Opp. at 10, 14.

The plaintiffs also seek the Court's recusal due to what they assert is the "unusually long time to issue decisions in this case." Pls.' Mot. for Rearg. at 33. The plaintiffs do not cite any authority supporting their request, and they do not argue that the Court is treating it differently than other litigants in the way it rules on the motions. The Court has inherent authority to manage dockets, and to balance its civil and criminal caseload. It has exercised that authority adjudicating the plaintiffs' voluminous filings, the breadth of which have far exceeded the narrow issues pending before the Court. The Court will deny the plaintiffs' request for recusal.

## CONCLUSION

For the foregoing reasons, the Court will grant the defendants' motion to dismiss or, in the alternative, motion for summary judgment [ECF No. 100], and deny the plaintiffs' cross motion for summary judgment, [ECF No. 103].[8] The Court will also deny the plaintiffs' second and third motions to supplement the record, and their motion for reargument based on new evidence and for the Court's recusal. [ECF Nos. 118, 120 & 127].  The Court has considered the other arguments raised by the plaintiffs and found them unavailing. An appropriate order accompanies this opinion.


September 10, 2020                          _____

                                                Thomas F. Hogan
                                           SENIOR UNITED STATES DISTRICT JUDGE


---

[8] As the defendants argue, because John Doe PLLC is a corporate entity, it cannot properly appear before the Court unless it is represented by counsel. LCvR 83.2; *see Greater Se. Cmty. Hosp. Found., Inc. v. Potter*, 586 F.3d 1, 4 (D.C. Cir. 2009) (quoting *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993)) ("'It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel.'"); *Lennon v. McClory*, 3 F. Supp. 2d 1461, 1462 n.1 (D.D.C. 1998) ("A corporation cannot represent itself and cannot appear *pro se*."). Because there are no remaining claims in this case, the Court takes no action in this regard.